## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Tammy Lee Ann Johansen,                         Civil No. 10-2076 (DWF/SER)

      Plaintiff,

     v.                                    **REPORT AND RECOMMENDATION**

Michael J. Astrue, Commissioner
of Social Security,

      Defendant.

---

    Fay E. Fishman, Esq., Peterson & Fishman, 3009 Holmes Avenue South, Minneapolis, MN 55408, for Plaintiff.

    Lonnie Bryan, Esq., United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Defendant.

---

STEVEN E. RAU, United States Magistrate Judge

    Pursuant to 42 U.S.C. § 405(g), Plaintiff Tammy Lee Ann Johansen seeks review of the final decision of the Commissioner of Social Security's ("Commissioner"), denial of Johansen's application for social security disability insurance ("SSDI"). Cross motions for summary judgment, [Docket Nos. 11 and 18], have been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and District of Minnesota Local Rule 72.1. For the reasons set forth below, the Court recommends that Plaintiff's motion be denied and Defendant's motion be granted.

## I.      BACKGROUND

### A.      Procedural History

    Plaintiff Tammy Lee Ann Johansen ("Johansen") applied for SSDI on April 1, 2008, with a protective filing date of March 7, 2008. (Admin. R. at 15, 129-132). She alleged a disability onset date of January 25, 2008, which was later amended to November 1, 2008, based on her later

completion of chemical dependency counseling and her sobriety date.[1]   (*Id.* at 15, 28, 129-132).

Johansen alleged disability due to anxiety, depression, dysthymia, history of substance abuse, a

gambling addiction, and attention deficit disorder ("ADD").   (*Id.* at 29-30, 150-151).   The

applications were denied initially and upon reconsideration.   (*Id.* at 66-69, 71-72).   Johansen

requested a hearing before an Administrative Law Judge (ALJ), which was held before ALJ Roger

W. Thomas on September 25, 2009.   (*Id.* at 76-77, 114-16).   On October 16, 2009, ALJ Thomas

issued an unfavorable decision.   (*Id.* at 12-29).   The Appeals Council denied a request for further

review on April 29, 2010.   (*Id.* at 1-6, 23).   The denial of review made the ALJ's decision the final

decision of the Commissioner.   42 U.S.C. § 405(g); *Wilburn v. Astrue*, 626 F.3d 999, 1002 (8th Cir.

2010); *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).

## B.      Johansen's Testimony

Johansen completed one year of college and had past work experience as a court

receptionist.   (Admin. R. at 32-33).   At the time of the hearing, Johansen was living alone; her

husband was in a group home because of schizophrenia.   (*Id.* at 29-31).   Johansen testified that she

had ongoing mental problems and stress related to her family situation and recent family tragedies,

including her husband's mental illness, the deaths of two brothers, a car accident in which a brother

was paralyzed, and the foreclosure of her home.   (*Id.* at 37-39).

At the time of the hearing, Johansen was no longer using alcohol.   (*Id.* at 33).   She stopped

drinking around the time she began taking mood disorder medication, sometime between 2006 and

2008.   (*Id.* at 33).   With respect to the activities of daily living, Johansen testified she was able to

take basic care of herself, bathe, dress herself, bake, cook, feed herself, do dishes, do some cleaning,

---

[1] Under 1996 amendments to the Social Security Act, if a claimant's substance abuse is a "contributing factor material to the Commissioner's determination" of a disability, the claimant is not entitled to benefits.   42 U.S.C. § 423(d)(2)(C); *Vester v. Barnhart*, 416 F.3d 886, 888 (8th Cir. 2005).

and go shopping.  (*Id*. at 34, 45-46).  She did not have a social life or visit with friends, but did speak to her mother by phone nearly every day.  (*Id.* at 48).

Johansen acknowledged that she had been diagnosed with obsessive compulsive issues, including a gambling problem.  (*Id*. at 35-36).  She had not been hospitalized for mental health issues.  (*Id.* at 38).  Johansen was taking medication for depression and acknowledged that it was "working."  (*Id.* at 38).  She was also undergoing Dialectical Behavioral Therapy ("DBT"),[2] which she also stated had "really helped."  (*Id.* at 38-39).  In response to questioning from her counsel, Johansen asserted that while medicine and therapy helped, they did not alleviate all her symptoms. (*Id.* at 42).  She stated that she cried a couple of times per day, experienced guilt and hopelessness, had flashbacks to painful memories, and worried about the future.  (*Id.*).  Johansen testified that she was distracted easily and had problems focusing.  (*Id.* at 43).  With respect to her anxiety, approximately two to four times per day, Johansen would feel nervous, afraid, and like something bad was going to happen.  (*Id.* at 44).  Johansen stated that her anxiety left her feeling overwhelmed, emotionally drained, and without energy.  (*Id.* at 44, 46).  Johansen admitted that she occasionally had "good days," when she had DBT therapy or when she went to the library or for a walk.  (*Id.* at 45).  On "bad days" Johansen turned on the television but did not watch it.  (*Id.* at 46). She would not do housework, cook, read, or leave her home on those days.  (*Id.* at 46-47).  Johansen estimated every four out of seven days was a "bad day" and sometimes she thought about suicide. (*Id.*).  With respect to mental impairments, Johansen agreed with the limitations imposed by her treating psychiatrist.  (*Id.* at 39).

---

[2] DBT is a type of cognitive behavioral therapy that teaches behavioral skills to help individuals tolerate stress, regulate emotions, and improve relationships with others. http://www.mayoclinic.org/depression/treatment.html  (last accessed August 1, 2011).

### C.     Johansen's Mother's Testimony

Johansen's mother, Kathy Charette, testified at the administrative hearing on behalf of her daughter.  Charette testified that she went to Johansen's house every day or every other day to help with housework.  (*Id.* at 49).  Charette described Johansen as forgetful and stated she would misplace things, and had difficulties focusing and staying on task.  (*Id.* at 50).  Charette often reminded Johansen to do things, such as finishing laundry, putting away her clothes, or taking medicines.  (*Id.* at 51).  On bad days, Charette observed Johansen would lie on the couch and cry. (*Id.* at 52).  Charette confirmed that Johansen had more bad days than good days.  (*Id.*).

### D.     Medical Evidence In The Record[3]

### 1.     Evidence Predating Disability Onset Date

On February 1, 2008, Johansen visited Physician's Assistant Rebecca Brandt for her depression and seeking completion of FMLA paperwork.  (*Id.* at 347).  At that time, Johansen was caring for her mother because of her hip replacement surgery and her husband because of a change in his schizophrenia medication.  (*Id.*).  She was feeling "teary eyed," exhausted, and depressed. (*Id.*).  Brandt diagnosed grief reaction and dysthymia[4] and prescribed Celexa.  (*Id.*).  At the end of February, Johansen did not feel well enough to return to work.  (*Id.* at 346).  Johansen felt her depression had worsened, and she had no motivation.  (*Id.*).  Johansen quit taking the Celexa because of side effects and began taking Lexapro in the mornings, finding that her mood improved by the afternoon.  (*Id.*).  Johansen admitted taking a friend's Vicodin every other day from

---

[3] Johansen received treatments for certain temporary conditions unrelated to her allegedly disabling impairments (e.g. sinusitis, bronchitis).  Medical treatment for these conditions will not be discussed in this Report and Recommendation, unless those medical records discussed or related to one of Johansen's allegedly disabling impairments.

[4] A chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness.  *Stedman's Medical Dictionary*, Dysthymia (27th Ed. 2000).

September to mid-February. (*Id.*). Brandt prescribed Lexapro and recommended counseling. (*Id.*). On March 5, 2008, Brandt filled out FMLA paperwork for Johansen stating she suffered from serious health conditions of grief, depression, and chemical dependency, beginning on February 26, 2008 with an unknown duration. (*Id.* at 246-47).

Johansen saw psychotherapist Eldon Brue for an assessment on February 27, 2008. (*Id.* at 254-58). At that time, Johansen was taking Neurontin, Lexapro, and Xanax/alprazolam. (*Id.* at 254). Brue observed that Johansen was alert and cooperative. (*Id.* at 255). Johansen stated she had poor concentration and memory, and felt obsessive, anxious, depressed, and angry. (*Id.*). Johansen reported problems with alcohol and Brue opined that she had a potential chemical dependency problem. (*Id.* at 255-56). Brue noted Johansen's numerous family tragedies created stress and opined that Johansen's symptoms had begun more than two years earlier. (*Id.* at 256-57). He diagnosed moderate depression and polysubstance dependence. (*Id.*). On March 6, 2008, Brue referred Johansen to Marcie Henning, a Licensed Alcohol and Drug Counselor ("LADC") for a chemical dependency assessment. (*Id.* at 253). On April 16, 2008, Johansen visited Brue for completion of her employer's disability paperwork. (*Id.* at 252). Brue described Johansen as oriented with a normal affect and an anxious and depressed mood. (*Id.*). Brue filled out the paperwork stating Johansen's illness began in January 2007 and she suffered from dysthymia, polysubstance dependence, and a gambling addiction. (*Id.* at 248).

Johansen treated with psychiatric Physician's Assistant Sarah Simonsen on several occasions between March 8, and April 22, 2008. (*Id.* at 262-69). Johansen reported depression beginning in August 2007 and stated she hit "rock bottom" in January 2008. (*Id.* at 267). She described being irritable and having low energy but no difficulty sleeping. (*Id.* at 266-67). Johansen reported a gambling addiction, a history of meth use, and dependence on narcotic pain medications. (*Id.*). During these appointments, Simonsen observed that Johansen had appropriate

affect and speech and logical thought process, poor judgment, and fair insight.  (*Id.* at 260, 266, 267-68).  Simonsen diagnosed polysubstance dependence, gambling addiction, and dysthymia, with severe social/environmental problems concerning her husband and finances.  (*Id.* at 269).  Simonsen rated Johansen's GAF at 50.[5]  Simonsen continued Johansen's prescriptions for Neurontin and Lexapro and recommended therapy and inpatient chemical dependency treatment.  (*Id.* at 266, 269). On April 8, 2008, Johansen sought a refill of her alprazolam because of increased anxiety because her husband was on a 72-hour psychiatric hold.  (*Id.* at 263).  Simonsen refused to renew the prescription because of Johansen's chemically dependency issues and instead prescribed Hydrozine (an antihistamine used to treat nervousness and manage withdrawal symptoms).  (*Id.* at 262).  On April 22, 2008, Johansen was experiencing withdrawal symptoms after stopping taking Vicodin and Tramadol.  (*Id.* at 259-60).  Simonsen repeated her previous diagnoses and continued Johansen's prescriptions.  Johansen planned to begin chemical dependency treatment at Unity Hospital in April 2008. (*Id.*).

Johansen partially completed an outpatient substance abuse program at Unity Hospital between April 28, 2008 and May 6, 2008.  (*Id.* at 273).  During the program, Johansen was diagnosed with alcohol dependence, opioid dependence, methamphetamine abuse/rule out dependence, anxiety and depression (by patient self-report).  (*Id.* at 274).  LADC Michael Cain assigned Johansen a GAF of 60 at the time of her discharge.[6]  (*Id.* at 274).  Because Johansen continued to use Tramadol and Vicodin on a daily basis during the treatment, Cain recommended an inpatient detox program.  (*Id.* at 273-75).

---

[5] A Global Assessment of Functioning (GAF) score is a doctor's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. *American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders Text Revision,* 32-34 (4th ed. 2000).  A GAF between 41 and 50 is indicative of a severe impairment and serious limitations in social, occupational, or school functioning.  *Martise v. Astrue*, 641 F.3d 909, 917 n. 5 (8th Cir. 2011).

[6] A GAF between 51 and 60 indicates moderate symptoms.  *Brown v. Astrue*, 611 F.3d 941, 955 (8th Cir. 2010).

Johansen returned to Brandt on May 5 and 8, 2008 for FMLA paperwork.  (*Id.* at 343, 345).
Brandt noted that Johansen continued to use Vicodin.   (*Id.*).   She diagnosed polysubstance
dependence, dysthymic disorder, and grief reaction.  (*Id.*).

On May 12, 2008, Johansen filled out a Function Report-Adult for the SSA (*Id.* at 160-67).
In the report, Johansen stated her daily activities included listening to the radio, watching TV, a two
hour nap, cleaning, and making something to eat.  (*Id.* at 160).   She made daily goals, but usually
only completed one or two.  (*Id.*).   Johansen reported she did not take care of pets or anyone else.
(*Id.* at 161).   Before her impairments, Johansen was able to work, enjoyed outdoor activities,
exercised, and did more housework.  (*Id.*).   She slept a lot because of her illnesses but sometimes
would have problems falling asleep or staying asleep.  (*Id.*).   Johansen stated she did not need
reminders to take care of her personal needs or to take her medicines, and she was able to prepare
her own meals including canned soup and frozen pizza.  (*Id.* at 162).   With help and encouragement,
every other week Johansen did housework including laundry, dishes, and mowing the lawn.  (*Id.*).
Johansen shopped approximately every other week for a couple of hours at a time.  (*Id.*).   Her
reported hobbies included reading, watching TV, listening to music, bicycling, painting, gardening,
walking, hiking, and attending garage sales.  (*Id.* at 164).   She stated, however, that because of her
illnesses she no longer did these activities with any frequency.  (*Id.*).   Johansen reported that she
spent time on the phone, would visit her husband in the hospital, and attended doctor appointments.
(*Id.* at 164).   Johansen stated she sometimes did not want to talk to her family and would get angry
if they insisted on visiting.  (*Id.* at 165).   Johansen noted that her illnesses affected her talking,
memory, ability to complete tasks, and concentration.  (*Id.* at 165).   She asserted she had a short
attention span, had problems finishing what she started, and did not handle stress or changes in
routine well.  (*Id.* at 165-66).

Johansen's mother also filed out Function Report and confirmed her daughter's self-reported symptoms and daily activities.  (*Id.* at 171-78).  Charette reported Johansen could not concentrate, was often irritated, slept a lot, and could only accomplish the "really important" tasks.  (*Id.* at 171).  Charette stated that Johansen was unable to do housework or be active but she was able to take care of her personal needs, prepare her own meals, drive, shop and maintain her finances.  (*Id.* at 172-74).  Charette described Johansen's hobbies as reading, watching TV, baking, and bicycling, and stated she did these activities on a weekly basis.  (*Id.* at 175).  Charette stated that Johansen did not do much socializing, other than visiting her husband in the hospital.  (*Id.* at 175-76).  Charette contended that Johansen's illnesses affected her memory, ability to complete tasks, concentration, and ability to follow instructions.  (*Id.* at 176).  Charette also stated that Johansen was poor at handling stress or changes in routine.  (*Id.* at 177).

On May 21, 2008, state agency psychologist R. Owen Nelsen reviewed Johansen's records and completed a Mental Residual Functional Capacity Assessment.  (*Id.* at 298-315).  He diagnosed Johansen with depressive syndrome characterized by decreased energy, dysthymia, and substance addiction disorder.  (*Id.* at 301, 306).  He concluded these impairments caused Johansen a mild limitation in the activities of daily living, moderate limitations in maintaining social functioning and maintaining concentration, persistence or pace, and no episodes of decompensation.  (*Id.* at 308).  Nelsen concluded Johansen's impairments were severe but did not meet a listing.  (*Id.* at 310).  Nelsen summarized that Johansen retained the capacity to concentrate on, understand, and remember three to four step uncomplicated instructions, but would be markedly impaired for detailed or complex instructions.  (*Id.* at 314).  He asserted that Johansen's ability to handle co-worker and public contact would be reduced but she could handle brief and superficial contact.  (*Id.*).  Nelsen contended Johansen would have a reduced ability to tolerate and respond appropriately to supervision but she could handle ordinary levels of supervision in a customary

work setting.  (*Id.*).  Finally, he stated that Johansen would have a reduced ability to handle work stress and pressure but she could handle the stresses of routine, repetitive, or three-to-four step work settings.  (*Id.*).

Johansen returned to Simonsen on May 21, 2008.  (*Id.* at 336).  Johansen reported no problems with her sleep, appetite, interest in activities, cognition, or concentration, but she continued to experience guilt and depression.  (*Id.*).  She acknowledged she needed another chemical dependency assessment.  (*Id.*).  Johansen asked to change her prescription of Lexapro because she did not feel it was helping and Simonsen replaced it with Effexor.  (*Id.*).

Johansen saw psychiatrist Dr. Jonathan Uecker on at least five occasions between July 24, 2008 and her alleged onset date of November 2008, for treatment and medication management of depression.  (*Id.* at 324-25, 328-35).  Although her symptoms varied slightly, generally Dr. Uecker observed that Johansen's appearance and speech were normal, her memory was between good and fair, her concentration varied between good and poor, and her judgment and insight were rated as either fair or poor.  (*Id.* at 330, 333, 335).  Johansen complained of sleep problems, low energy, anhedonia,[7] irritability, stress and anxiety. (*Id.* at 331-32, 324-35).  Johansen continued to report depression, which Dr. Uecker concluded was complicated by her narcotic medication abuse and family and financial problems.  (*Id.* at 331).  Dr. Uecker diagnosed major depression, recurrent versus narcotic-induced mood disorder, depressed type, narcotic dependence, history of methamphetamine abuse, history of alcohol abuse, and history of gambling addiction.  (*Id.* at 333). In July 2008, he assigned Johansen a GAF of 50.  (*Id.*).  Dr. Uecker tried various prescriptions and dosages for Johansen's depression during this time period, including Cymbalta, Topamax, and Zoloft (*Id.* at 324-25, 329-30, 333, 335).  He also recommended chemical dependency treatment and

_____

[7]  A lack of interest or pleasure from the performance of activities that would ordinarily be pleasurable.  *Stedman's Medical Dictionary*, Anhedonia (27th Ed. 2000).

counseling.  (*Id.*).  At the October 21, 2008 appointment, Dr. Uecker noted Johansen was engaging in chemical dependency counseling with LADC Steve Hanson.  (*Id.* at 328, 324-25).  At that time she quit using narcotics.  (*Id.* at 389).

### 2.      Medical Records Between the Onset Date and the ALJ's Decision

Johansen had at least eight additional appointments with Dr. Uecker between November 21, 2008 and August 24, 2009.  (*Id.* at 327, 355, 363-64, 367-69, 373, 377-79, 383).  Throughout this time period, Dr. Uecker noted the stressors in Johansen's life, including her husband's schizophrenia and hospitalization, financial problems including the foreclosure on her house, and a July 2009 car accident in which her brother was paralyzed.  (*Id.* at 327, 355, 363-64, 377).  Dr. Uecker worked to manage Johansen's symptoms with prescriptions for Topamax, Abilify, Cymbalta, Seroquel, Trazadone, and Zyprexa.  (*Id.* at 327, 355, 363-64, 373, 378).  During this nine month period, Dr. Uecker observed Johansen's appearance was good, her speech normal, her thought processes were logical, her memory was good to fair, her attention span and concentration were good to fair, and her judgment and insight were fair to poor.  (*Id.* at 355, 363-64, 378).  At times he described her mood as euthymic,[8] but her mood was depressed shortly after her brother's accident.  (*Id.*).  At her final appointment before the ALJ hearing, Dr. Uecker noted Johansen's symptoms had improved and he described her mood as euthymic.  (*Id.* at 373).

Charette completed another Function Report for the SSA on January 24, 2009.  (*Id.* at 195-202).  She stated that Johansen had little interest in activities and no longer cooked.  (*Id.* at 198-99).  Johansen was having problems managing her finances, would spend money compulsively, and then return the items she bought.  (*Id.*).  According to Charette, Johansen had no hobbies and did not socialize much.  (*Id.*).  Charette described Johansen as easily distracted and stated she sometimes

---

[8] A feeling of joyfulness; mental peace, and tranquility; moderation of mood, not manic or depressed.  *Stedman's Medical Dictionary*, Euthymia & Euthymic (27th Ed. 2000).

did not make sense when she spoke. (*Id.* at 200). Johansen continued to have difficulties handling stress and displayed anger, guilt, and mood swings. (*Id.* at 201).

Johansen also completed another Function Report on January 26, 2009. (*Id.* at 206-13). She reported that she would stay in bed until her mother called her to make sure she was eating and taking her medications. (*Id.* at 206). Johansen reported she had no problems with taking care of her personal needs but needed reminders to take her medications. (*Id.* at 207-08). She reported that she no longer cooked or prepared her own meals because she lacked energy and could not concentrate. (*Id.* at 208). Johansen's mother visited on a daily basis to help with housework and chores. (*Id.*). Johansen asserted that she was able to take care of her finances with her mother's help. (*Id.* at 209). She stated she had lost all interest in her hobbies and would get distracted when reading or watching TV. (*Id.* at 210). Johansen reported that she needed appointment reminders. (*Id.*). She stated she had problems with anxiety and anger with large crowds of people. (*Id.* at 211). Johansen contended her illness caused her problems with sitting, talking, hearing, her memory, completing tasks, concentration, understanding, following instructions, and getting along with others. (*Id.*). She described having a short attention span, experiencing panic attacks in stressful situations or with changes in routine and crying at least three times per day. (*Id.* at 211-12).

On February 6, 2009, state agency consultant psychologist Ray Conroe reviewed the assessment of agency psychologist Nelsen. (*Id.* at 352-53). Conroe incorrectly reported that Johansen had not stopped using drugs; the medical records reflect she stopped using narcotics in the fall of 2008. (*Id.* at 328, 324-25, 352). He remarked that Johansen's mental status examinations showed she had logical thought-processes, she denied suicidal ideation, denied psychosis, showed good judgment and insight, had intact memory, had good attention and concentration, and her mood and affect were euthymic. (*Id.* at 352). Based on this information, Conroe affirmed Nelsen's assessment. (*Id.*).

Johansen began counseling with psychologist Kyle Norton in May 2009 and continued the counseling through August 2009.  (*Id.* at 358-62, 372, 376, 384).  At the initial meeting, Johansen presented as neatly groomed, alert, cooperative, with normal speech, and clear thought and perception.  (*Id.* at 359).  Her mood was anxious, depressed, and tearful.  (*Id.*).  She reported feeling stressed, depressed, had trouble relaxing, problems staying focused, difficulties concentrating, and short term memory loss.  (*Id.* at 360).  Johansen continued to note the stresses in her life.  (*Id.*).  Norton diagnosed major depressive disorder and past narcotic dependence.  (*Id.* at 361).  He assigned Johansen a GAF of 50.  (*Id.*).  Johansen began DBT therapy with Norton.  (*Id.* at 356).  On May 11, 2009, Johansen reported trouble with memory loss.  (*Id.* at 357).  On July 24, 2009, Norton noted Johansen had been "doing really well" before her brother's car accident.  (*Id.* at 384).  On August 31, 2009, Norton stated Johansen "[h]ad a little breakdown over the weekend.  Felt like [her] personality changed."  (*Id.* at 372).  At that time Norton observed that Johansen's concentration was poor but rated her mood as normal.  (*Id.*).

Psychologist Dale Barron completed an intake and assessment of Johansen on July 8, 2009, for depression, concentration problems, and ADHD.  (*Id.* at 388-91).  At that time, Johansen was separated from her husband and he was hospitalized for his schizophrenia.  (*Id.* at 388).  Barron recited Johansen's medical and social history, including Johansen's prior history of chemical dependence and the stressors in her life.  (*Id.* at 388-90).  He noted Johansen was groomed, cooperative, and had normal speech and thought presentation, but that her memory was impaired, she suffered from sleep disturbance, and she exhibited a depressed mood.  (*Id.* at 389).  Barron stated Johansen's symptoms included problems staying on task and concentrating, "chronic forgetfulness, problems with time management, a tendency to take on far too many tasks, a disorganized lifestyle, low frustration tolerance, a tendency to interrupt others in conversation, difficulties in managing paperwork, a chronic pattern of underachievement, a tendency to be

12

impulsive with major decisions, a tendency to give up on long-term projects, difficulties concentrating when reading, and depression." (*Id.* at 390). He performed psychological testing including the Wender Scale and Brown Attention Activation Disorder Scale, both of which supported the conclusion that Johansen had adult ADD/ADHD. (*Id.*). He also completed the WAIS-IV IQ test, in which Johansen fell into the low-average classification. (*Id.* at 385). He diagnosed major depressive disorder, recurrent, moderate and ADHD, predominately inattentive type. (*Id.* at 386, 391). Barron stated that normally he would recommend a stimulant medication, but did not for Johansen because of her past chemical dependency issues. (*Id.* at 390). He assigned Johansen a GAF of 55 and stated "serious symptoms of both disorders which impair her ability to think clearly, stay on task, concentrate, and keep up with day to day tasks of life." (*Id.* at 391).

Dr. Uecker completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) for the SSA sometime in July 2009. (*Id.* at 367-69). Dr. Uecker concluded that Johansen had a fair ability to follow work rules, relate to co-workers, use judgment, interact with supervisors, deal with work stresses, function independently, maintain attention and concentration, follow simple job instructions, follow detailed but not complex job instructions, maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. (*Id.*). He concluded she would have poor or no ability to deal with the public, or to remember and carry out complex job instructions. (*Id.*). Dr. Uecker stated Johansen had a very low stress tolerance, and that she complained of poor memory and disorganization. (*Id.* at 368-69). He asserted that Johansen would miss work more than three times per month because of her impairments and that she would not be able to manage her own benefits because of her gambling and substance abuse issues. (*Id.* at 369).

On August 6, 2009, Johansen saw psychologist Janet Stam, a gambling treatment provider, for a gambling dependence assessment and treatment. (*Id.* at 393-395). Johansen reported that her

"gambling was out of control and she needed help to stop." (*Id.* at 393).  Johansen would go to the casino twice per week to play slot machines would spend between $100 and $1000 per day, owed money on her credit cards, and cashed-in her retirement money to pay her gambling debts.  (*Id.*). Stam concluded Johansen met the DSM-IV criteria for Pathological Gambling, severe, and recommended gambling treatment.  (*Id.* at 393, 395).

In August 2009, Johansen was still participating in DBT therapy.  (*Id.* at 376).  She was also attending gambler's anonymous meetings.  (*Id.*).  At that time, Norton described Johansen's mood as normal and noted she had demonstrated "moderate improvement."  (*Id.*).

### E.      Evidence From the Vocational Expert

A vocational expert (VE), Robert Brezinski, testified at the hearing.  (*Id.* at 54-62).  The ALJ asked the VE to consider a hypothetical person of 46-47 years of age, with 13 years of education, and past work experience as a receptionist and social services aide.  (*Id.* at 55, 241).  The hypothetical person suffered from the following impairments:  pathological gambling addiction; major depressive disorder; dysthymia disorder; moderate ADHD, inattentive type; narcotic dependency; history of substance abuse; rhinitis; and grief reaction.  (*Id.* at 55-56).  The hypothetical person had an IQ of 81.  (*Id.* at 56).  The ALJ then directed the VE to consider the person to be limited to routine repetitive three to four step tasks and instructions, superficial contact with co-workers and the public, no more than routine stressors, and an environment without exposure to alcohol or drugs.  (*Id.*).  In response to this hypothetical, Brezinski opined that such a person could not return to Johansen's past relevant work because those jobs would involve more than routine repetitive three to four step work.  (*Id.*).  The hypothetical person would be able to perform work as an unskilled hand packager, a laundry worker, or as a production assembly worker. (*Id.* at 56-57).

The ALJ then directed the VE to consider adding to the hypothetical the additional limitations of poor or no abilities in dealing with the public and following complex job instructions, and fair abilities in following work rules, relating to co-workers, using judgment, interacting with supervisors, dealing with work stresses, functioning independently, maintaining attention and concentration, following detailed and simple job instructions, maintaining personal appearance, behaving in an emotionally stable manner, relating predictably in social situations, and demonstrating reliability. (*Id.* at 57-58, 367). Even with these additional restrictions, the VE testified that the hypothetical person would be able to work as a hand packager, a laundry worker, or as a production assembly worker. (*Id.* at 58). The ALJ next asked the VE to add to the hypothetical that the individual would have more than three absences per month. (*Id.*). With this additional restriction, the VE testified that the hypothetical individual would not be able to be competitively employed. (*Id.*).

Johansen's attorney asked the VE to consider the hypothetical person with serious limitations in following work rules, relating to co-workers, using judgment, interacting with supervisors, dealing with work stresses, functioning independently, maintaining attention and concentration, following simple job instructions, maintaining personal appearance, behaving in an emotionally stable manner, relating predictably in social situations, and demonstrating reliability. (*Id.* at 58-60). In response the VE testified that it would be a "borderline situation" regarding whether such a hypothetical person could be competitively employed. (*Id.* at 60-61). The attorney then asked the VE to add to the hypothetical that a person would have difficulty sustaining attention and tasks, often would not listen when spoken to directly, did not follow through on instructions, often had difficulty organizing tasks, would be easily distracted by external stimuli, often was forgetful, and often would interrupt or intrude on other's conversations. (*Id.* at 61). The VE stated that such a hypothetical person would be precluded from competitive work. (*Id.* at 62).

F.      The ALJ's Decision

The Administrative Law Judge, Roger W. Thomas, employed the required five-step sequential evaluation in his opinion:  (1) whether the claimant had engaged in substantial gainful activity; (2) whether the claimant had a severe impairment; (3) whether the claimant's impairment met or equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether the claimant was capable of returning to past work; and (5) whether the claimant could do other work existing in significant numbers in the regional or national economy.  20 C.F.R. § 404.1520(a)-(f).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the onset date of November 1, 2008.  (Admin. R. at 17).  At step two, the ALJ found that Plaintiff had severe impairments of:  pathological gambling disorder; major depressive disorder; attention deficit disorder; anxiety; and a history of treatment for chemical dependence.  (*Id*).

At the third step, the ALJ concluded that none of Plaintiff's impairments or combination of impairments met or equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 and applying the special techniques for assessment of mental impairments pursuant to 20 C.F.R. § 404.1520a.  (*Id.* at 17-18).  The ALJ concluded Johansen did not meet listings 12.02, 12.04, 12.06, or 12.09 because she did not satisfy the "paragraph B criteria."  (*Id.*).  Specifically, the ALJ concluded that Johansen had only mild restrictions in the activities of daily living because she was able to do some household activities, she could prepare meals, clean, do laundry and go shopping.  (*Id.* at 18).  He concluded Johansen had moderate restrictions in social functioning because she was able to go out in public unaccompanied, had stable relationships with her mother and siblings, and related appropriately to her medical providers.  (*Id.*).  ALJ Thomas determined Johansen had only moderate difficulties with regard to concentration, persistence, or pace.  (*Id.*).  He stated "[d]espite the claimant's allegations of severe limitations in this area[,] psychological evaluations have consistently found her to be fully orientated, with a logical goal directed thought process, and intact

concentration, focus, and memory." (*Id.*).  The ALJ also noted Johansen had not had any periods of decompensation.  (*Id.*).  Because Johansen did not have marked restrictions in these areas and no evidence of decompensation, the ALJ concluded Johansen did not meet the "paragraph B" criteria and therefore did not meet any of the mental disorder listings.  (*Id.*).  The ALJ also concluded that the evidence failed to establish the presence of "paragraph C" criteria.  (*Id.*).

Turning to step four, the ALJ found that Plaintiff had the residual functional capacity (RFC): "to perform a full range of work at all exertional levels but with the following nonexertional limitations:   routine repetitive 3 to 4 step tasks/instructions; brief and superficial contact with others; routine stressors; and no alcohol or drugs." (*Id.* at 18-19).  The ALJ considered Johansen's daily activities, work history, history of treatment, and the medical records.  (*Id.* at 19-20).  Based on this analysis the ALJ stated "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (*Id.* at 19). ALJ Thomas gave "significant weight" to the opinions of the State agency medical consultants.  (*Id.* at 20).  The ALJ declined to give controlling weight to Dr. Uecker's opinion stating:

> The undersigned has also considered but not given controlling weight to the opinion of Dr. Uecker, a treating source. (Exhibit 13F) It was the opinion of Dr. Uecker that the claimant had many limitations, which the undersigned recognizes would be incompatible with the ability to work on a competitive basis, such as an expected absentee rate of more than three days per month. (Exhibit 13F) However, though a treating physician, Dr. Uecker does not have a long term treatment relationship with the claimant, his opinion is largely based on the claimant's subjective allegations, which the undersigned has found to be not fully credible, it is not well supported by clinical findings, laboratory diagnostic techniques, and is not consistent with her substantial evidence of record, as discussed in more detail in the text of this decision.

(Admin. R. at 20). The ALJ also noted that Johansen only sought mental health treatment as part of her application for disability benefits and that the record did not demonstrate a strong motivation to return to work. (*Id.* at 19-20).

At the fifth step, the ALJ determined that, based on the above RFC, Johansen could not perform her past relevant work. (*Id.* at 20). The ALJ concluded, however, that Johansen could perform work as a hand packager, a laundry worker, and as an assembler, and that there were significant jobs in the national economy that a person with Plaintiff's age, education, work experience, and RFC could perform. (*Id.* at 21).

## II.     STANDARD OF REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded. "The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability." *Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992). "Disability" under the Social Security Act is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). The claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A). The impairment must have lasted or be expected to last for a continuous period of at least twelve months, or be expected to result in death. *Id.* § 423(d)(1)(A).

### A.     Administrative Review

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision. 20 C.F.R. § 404.909(a)(1). A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ. *Id.* § 404.929. If the claimant is dissatisfied with the ALJ's decision, he or she may request Appeals Council review, although that

is not automatic.  *Id.* §§ 404.967-.982.  The decision of the Appeals Council, or of the ALJ if the request for review is denied, is final and binding upon the claimant unless the matter is appealed to federal district court within sixty days after notice of the Appeals Council's action.  42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. § 404.981.

## B.     Judicial Review

Judicial review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence in the record as a whole.  *Tellez v. Barnhart*, 403 F.3d 953, 956 (8th Cir. 2005); *Hutsell v. Sullivan*, 892 F.2d 747, 748-49 (8th Cir. 1989).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  The review is "more than a mere search of the record for evidence supporting the [Commissioner's] finding."  *Brand v. Sec'y of Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).  Rather, "the substantiality of evidence must take into account whatever in the record fairly detracts from its weight."  *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)); *Kirby v. Sullivan*, 923 F.2d 1323, 1326 (8th Cir. 1991).

The reviewing court must review the record and consider:

1. The credibility findings made by the ALJ;
2. The plaintiff's vocational factors;
3. The medical evidence from treating and consulting physicians;
4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;
5. Any corroboration by third parties of the plaintiff's impairments; and
6. The testimony of vocational experts when required, which is based upon a proper hypothetical question which sets forth the claimant's impairments.

*Johnson v. Chater*, 108 F.3d 942, 944 (8th Cir. 1997) (citing *Cruse v. Bowen*, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).  A court may not reverse the Commissioner's decision simply because

substantial evidence would support an opposite conclusion.  *Tellez*, 403 F.3d at 956; *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).  In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact.  *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).  Instead, the court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987).  If it is possible to draw two inconsistent positions from the evidence and one of those positions supports the Commissioner's decision, the court must affirm that decision.  *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

## III.   DISCUSSION

In the instant case, Johansen contends that the Commissioner's decision is erroneous because:  (1) the ALJ improperly weighed the medical source opinions; (2) the ALJ incorrectly found Johansen's subjective complaints not credible; and (3) the ALJ did not propound a proper hypothetical to the VE.  This Court disagrees and concludes that the ALJ's opinion is supported by substantial evidence in the record.

### A.      Analysis of Medical Source Opinions

Johansen argues that the ALJ erred in his analysis of the medical opinions because:  (1) he should not have rejected the opinion of Dr. Uecker; (2) he improperly failed to discuss Barron's opinion; and (3) he should not have relied on the opinions of the state agency consultants.  This Court concludes that the ALJ did not error in his analysis regarding the weight given to the opinions of these medical providers.

A treating physician's opinion is typically entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory and diagnostic techniques and is not inconsistent with other substantial evidence in [the] record."  *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir. 2000)); *Clevenger v.*

*Social Sec. Admin.*, 567 F.3d 971, 974 (8th Cir. 2009); 20 C.F.R. § 404.1527(d)(2).   A treating physician's opinion does not automatically control, however, because the record must be evaluated as a whole.   *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005).   If the ALJ declines to grant controlling weight to a treating physician, the ALJ must consider a number of factors to determine how much weight to grant the medical opinion:   (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the quantity of evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the treating physician is also a specialist; and (6) other factors "which tend to support or contradict the opinion."   20 C.F.R. § 404.1527(d); *see also Owen v. Astrue*, 551 F.3d 792, 800 (8th Cir. 2008).   The same factors apply to opinions of a testifying medical expert.   20 C.F.R. § 404.1527(f)(2)(iii).   The ALJ must give good reasons for the particular weight given to a treating physician's evaluation.   20 C.F.R. § 404.1527(d)(2).

The ALJ may credit other medical opinions over that of a treating physician when such opinions are supported by better evidence or the treating physician has rendered inconsistent opinions.   *Prosch*, 201 F.3d at 1013; *Holmstrom v. Massanari*, 270 F.3d 715, 720 (8th Cir. 2001). Similarly, an ALJ may disregard an opinion that "consist[s] of nothing more than vague, conclusory statements."   *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir. 1996); *Thomas v. Sullivan*, 928 F.2d 255, 259 (8th Cir. 1991).   Conversely, an ALJ cannot assess a claimant's RFC by relying only on the opinions of non-treating physicians because such opinions do not constitute substantial evidence.   *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000).   An ALJ may give less weight to a physician whose opinions are based on subjective complaints rather than objective medical evidence.   *Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007).

In this case, substantial evidence in the record supports the ALJ's decision not to grant controlling weight to Dr. Uecker's opinion.   As the Commissioner correctly argues, the ALJ offered

a number of valid reasons for choosing not to give controlling weight to Dr. Uecker: Johansen did not have a long-term treatment relationship with the psychiatrist; his opinion was based largely on Johansen's subjective complaints; his opinion was not supported by clinical findings; and his opinion was not consistent with other evidence in the record. First, the Court notes the ALJ did not outright reject Dr. Uecker's opinions, but only declined to give them controlling weight. Indeed, the ALJ incorporated a number of functional limitations in the RFC based on Dr. Uecker's Medical Assessment of Ability to Do Work-Related Activities (Mental).

While it is true that Johansen saw Dr. Uecker regularly for more than a year, there is no bright-line test that determines when a treatment relationship is long enough to be considered controlling and this was only one factor in the ALJ's rationale. The ALJ's conclusion that Dr. Uecker's opinion is not consistent with other evidence in the record is supported by substantial evidence. In Johansen's later appointments with Norton, he described her mood as normal, not depressed or anxious, and he noted she had experienced moderate improvement. (Admin. R. at 372, 376, 384). Barron assigned Johansen a GAF of 55, indicating only moderate symptoms. While Norton assigned Johansen a GAF of 50, that was in May 2009 at his initial assessment, before Barron's opinion and months before the treating providers indicated Johansen had shown improvement in her symptoms. Further, while a GAF of 50 is the top of the scores indicating a severe impairment, courts have nevertheless affirmed denials of disability benefits for claimants' with GAFs of 50 when such an assessment was inconsistent with other medical evidence. *England v. Astrue*, 490 F.3d 1017, 1023 (8th Cir. 2007); *Thurman v. Apfel*, 211 F.3d 1270 (6th Cir. 2000). Dr. Uecker's opinion as to the extreme severity of Johansen's symptoms is also internally inconsistent with his treatment records. During the disability period, Dr. Uecker described Johansen as euthymic on a number of occasions and he indicated Johansen's symptoms improved in 2009. (*Id.* at 363-64, 373, 376). Finally, the ALJ is correct that Dr. Uecker's opinion was not based

on clinical findings, but rather was based on Johansen's subjective complaints.   There is no evidence in the record that Dr. Uecker performed any psychological tests regarding Johansen's impairments and ability to function (unlike Barron who did perform such tests).   In fact, Dr. Uecker's opinions mostly consist of check-marking boxes on a form and are essentially conclusory. As set forth more fully below, Johansen's reported daily activities are also inconsistent with Dr. Uecker's conclusions regarding Johansen's limitations, especially the suggestion she would miss more than three days of work per month.   Thus, substantial evidence supports the ALJ's decision to give less than controlling weight to Dr. Uecker's opinions.

Johansen next objects to the ALJ's failure to discuss Barron's opinion.   While the ALJ did not discuss what weight he gave to Barron's opinion, he did reference the exhibit containing Barron's assessment, 15F, in his analysis.   (Admin. R. 18-19).   The ALJ clearly incorporated Barron's assessment in his opinion because he included Barron's ADHD diagnosis as one of Johansen's severe impairments.   Further, "[a]lthough required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (citing *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)).   The ALJ did not err by failing to expressly discuss Barron's opinions.

Finally, the ALJ did not err by giving "significant weight" to the opinions of the state agency consultants.   As the ALJ stated, the state agency consultants' opinions are consistent with the moderate limitations Johansen experienced according to Barron and supported by the overall record.   While Nelsen's opinion came before Johansen's disability onset date, her medical records establish that her impairments and limitations at that time were mostly consistent with her limitations after her onset date, and if anything, her symptoms improved.   Conroe admittedly was mistaken in saying that Johansen was still using narcotics.   But this mistake does not compel the

23

conclusion that he did not review any records after Johansen's onset date.[9]  Further, the ALJ did not base his RFC solely on the opinions of the agency consultants.  Rather, the ALJ partially accepted the limitations recommended by Dr. Uecker, and limited Johansen to 3 and 4 step tasks, brief and superficial contact with others, and only routine stressors.  Thus other substantial evidence in the record beyond the opinions of the agency consultants supports the ALJ's determination of Johansen's RFC.  The fact the ALJ based his RFC, in part, on the opinions of the agency consultants was not error.

The record demonstrates that the ALJ reviewed the medical records and resolved the conflicts among the various medical opinions appropriately.  The Court is mindful that Johansen has experienced a great many tragedies and difficulties in her life and has experienced significant depressive symptoms.  Nevertheless, substantial evidence in the record as a whole supports the ALJ's decision that Johansen's mental impairments do not meet the definition of disability within the meaning of the Social Security Act.

**B.     Johansen's Credibility**

Johansen contends the ALJ erred in discounting her credibility regarding the severity of her impairments.  This Court disagrees and concludes that the ALJ's analysis of Johansen's credibility is supported by substantial evidence.

In the Eighth Circuit, the factors enunciated in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) govern credibility determinations.  In assessing subjective complaints, an ALJ must examine several factors:  "(1) the claimant's daily activities; (2) the duration, frequency[,] and intensity of pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and

---

[9]    Indeed, it appears from the Court's thorough examination of the administrative record, that the only confirmation in the medical records that Johansen ceased using drugs in the fall of 2008 is a statement in Barron's assessment that Johansen had been seeing Hanson for chemical dependency treatment in September and October 2008 and "she has been straight since this time." (Tr. 389).  This is also the only medical record Johansen cites in her brief for the proposition that she quit using drugs in November 2008.

aggravating factors; and (5) functional restrictions." *Brown v. Chater*, 87 F.3d 963, 965 (8th Cir. 1996) (citing *Polaski*, 739 F.2d at 1322). Other relevant factors are the claimant's work history and the objective medical evidence. *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999). "While these considerations must be taken into account, the ALJ's decision need not include a discussion of how every *Polaski* factor relates to the claimant's credibility." *Casey v. Astrue*, 503 F.3d 687, 695 (8th Cir. 2007). An ALJ may discount subjective complaints if they are inconsistent with the evidence as a whole. *Id.* (citing *Polaski*, 739 F.2d at 1322). Where an ALJ seriously considers, but for good reasons explicitly discredits a plaintiff's subjective complaints, the court will not disturb the ALJ's credibility determination. *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003); *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).

The ALJ clearly considered the *Polaski* factors in analyzing Plaintiff's credibility and subjective complaints. The ALJ concluded that the severity of Johansen's impairments were not consistent with the objective medical evidence. Substantial evidence supports this conclusion because, as set forth above, the medical evidence established only moderate limitations in functioning. The ALJ also discounted Johansen's credibility because her impairments improved with treatment, and Dr. Uecker and Norton's opinions echo this improvement. Further, the majority of medical records regarding Johansen's impairments are based on her subjective self-reports, which the ALJ was entitled to give less weight.

The ALJ also noted that Johansen's subjective complaints were not consistent with her daily activities, such as caring for herself, preparing meals, doing chores, shopping, driving, using a computer, speaking on the phone, and handling finances and medications. The ALJ noted that while Johansen has "bad" days, the record demonstrates that Johansen engaged in the activities of daily living on a sustained and routine basis, which repudiates the suggestion Johansen would miss

substantial days of work.[10]   While Johansen points out that the daily activities she reported in her Function Report forms were more limited than the activities the ALJ reported Johansen could do, the list of activities the ALJ cited are consistent with Johansen's testimony at the administrative hearing.  (Admin. R. at 34, 45-46).  Thus, Johansen's testimony is inconsistent with her Function Report forms.  The ALJ's failure to cite to Charette's assessment of Johansen's abilities does not require remand.  Admittedly, it is preferable for an ALJ to explicitly discuss third-party evidence in a credibility analysis.  *Smith v. Heckler*, 735 F.2d 312, 317 (8th Cir. 1984).  When third-party statements regarding a claimant's abilities, however, are the same as evidence that the ALJ rejected for other reasons specified in the opinion, remand is not required simply because of a "deficiency in opinion-writing technique."  *Robinson v. Sullivan*, 956 F.2d 836, 841 (8th Cir. 1992).   Here, Charette's statements about Johansen's impairments mirrored her daughter's, which the ALJ discredited properly.  Therefore, the ALJ's failure to analyze Charette's statements was not error.

The ALJ also noted that Johansen only sought treatment for her impairments in connection with her application for disability benefits.  While the ALJ was not specific about which records supported this conclusion, such detail is not necessary.  The records do reflect that Johansen only sought treatment for her depression in February 2008, a month before her protective filing date.  At her initial appointment with Brandt for depression, she asked to have FMLA paperwork filled out and she asked Simonsen for social security paperwork on March 17, 2008, only a month later.  (Admin. R. at 265).  The ALJ's conclusion that Johansen sought treatment for depression in connection with her disability applications based on the temporal proximity of her treatment and her SSDI applications is supported by the record.  Additionally, it was acceptable for the ALJ to consider factors suggesting Johansen might not be motivated to return to work in his credibility

---

[10] Johansen complains that the ALJ failed to comply with *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005), which suggests an ALJ should consider the frequency and independence of activities performed by the claimant.  The ALJ complied with *Reed* in his conclusion that Johansen could perform the activities of daily living on a sustained and routine basis.

analysis. *Tuttle v. Barnhart*, 130 Fed. Appx. 60, 61 (8th Cir. 2005) ("evidence indicating a lack of motivation to work may be used as a credibility factor so long as it is not a dispositive one"); *Ostronski v. Chater*, 94 F.3d 413, 419 (8th Cir. 1996) (concluding that the plaintiff's lack of motivation to work was a reasonable basis to discredit the subjective complaints);

The ALJ considered Johansen's subjective complaints regarding the severity of her impairments but found independent reasons, supported by substantial evidence, to discredit those complaints. Because the ALJ seriously considered Johansen's credibility and gave good reasons for disbelieving her subjective complaints, this Court will not disturb the ALJ's determination.

### C.      Hypothetical Question

Finally, Johansen argues that the ALJ's RFC determination is not supported by substantial evidence because the hypothetical question to the VE did not describe all of the limitations imposed by Dr. Uecker.[11]  This Court disagrees.

Residual functional capacity is what a claimant can do despite his or her limitations.  20 C.F.R. § 916.945(a).  It is the claimant's burden to prove the RFC.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).  In determining an RFC, the ALJ must consider all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his or her limitations.  *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007).  The RFC must be supported by some medical evidence that addresses the claimant's ability to function in the workplace.  *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004) (internal citations omitted).  Social Security Ruling 96-8p provides:

---

[11] Johansen also states that in response to a hypothetical to the VE based on limitations imposed by Barron, the VE concluded that Johansen could not be competitively employed.  The hypothetical Johansen's lawyer asked was based on Exhibit 15F, page 20, under the heading clinical syndromes.  As the ALJ recognized at the hearing, however, these descriptions are not functional limitations imposed by Barron, but rather are the diagnostic criteria for ADHD, predominately inattentive type, as set forth in the DSM-IV.  *Diagnostic and Statistical Manual of Mental Disorders*: DSM-IV-TR (4th Ed. 2000).

> [W]hen there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity.

SSR 96-8p, 1996 WL 374184 at *1 (Social Security Administration, July 2, 1996).

"A hypothetical question must precisely describe a claimant's impairments so that the vocational expert may accurately assess whether jobs exist for the claimant." *Howard v. Massanari*, 255 F.3d 577, 581-82 (8th Cir. 2001) (citing *Newton v. Chater*, 92 F.3d 688, 694-95 (8th Cir. 1996)). In order to constitute substantial evidence, testimony from a VE must be based on a properly phrased hypothetical question. *Id.*; *Roberts v. Apfel*, 222 F.3d 466, 471 (8th Cir. 2000). A hypothetical question is sufficient if it sets forth the impairments that are accepted as true by the ALJ. *Roberts*, 222 F.3d at 471; *House v. Shalala*, 34 F.3d 691, 694 (8th Cir. 1994). While the hypothetical question must set out all of Plaintiff's impairments, the ALJ "need not use specific diagnostic or symptomatic terms where other descriptive terms can adequately define the claimant's impairments." *Howard*, 255 F.3d at 582.

In this case, the Court concludes that the ALJ asked a sufficiently precise hypothetical question that took into account all of Plaintiff's limitations that have support in the record. As set forth above, the ALJ did not err in declining to adopt all of the functional limitations contained in Dr. Uecker's opinion. The ALJ incorporated the functional limitations Nelsen and Conroe described and, therefore, the hypothetical described Johansen's limitations sufficiently. Substantial evidence in the record supports the ALJ's RFC finding, and the ALJ did not err at steps four and five of the disability evaluation process in determining that Plaintiff could perform other work that exists in significant numbers in the economy.

**IV.      RECOMMENDATION**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY**

**RECOMMENDED** that:

1.      Plaintiff's Motion for Summary Judgment [Docket No. 11] be **DENIED**; and

2.      Defendant's Motion for Summary Judgment [Docket No. 18] be **GRANTED**.


Dated: August 15, 2011                                    s/ Steven E. Rau_____
                                                          STEVEN E. RAU
                                                          United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **August 29, 2011**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.   Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.   A party may respond to the objecting party's brief within ten days after service thereof.   A judge shall make a de novo determination of those portions to which objection is made.   This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.